# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 5, 2005 Session

## WILLIAM GLENN WILEY v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 95-C-1918     Walter C. Kurtz, Judge**

---

**No. M2003-00661-SC-R11-PC - Filed January 26, 2006**

---

We granted the applications for permission to appeal filed by the State of Tennessee and the petitioner to determine 1) whether State v. Burns, 6 S.W.3d 453 (Tenn. 1999), which clarified the analysis for determining lesser-included offenses, created a new constitutional rule that must be applied retroactively to post-conviction cases, 2) whether the petitioner was entitled to post-conviction relief under the DNA Relief Act, and 3) whether the petitioner was denied his right to the effective assistance of counsel at trial. The trial court and the Court of Criminal Appeals granted a new trial as to the petitioner's felony murder conviction because the jury had not been charged on the lesser-included offense of second degree murder but denied post-conviction relief as to the petitioner's conviction for especially aggravated robbery. After due consideration, we conclude 1) that State v. Burns did not create a new constitutional rule that must be retroactively applied to post-conviction cases, 2) that the petitioner was not entitled to a new trial or other relief based on DNA results, and 3) that the petitioner was denied his constitutional right to effective assistance of counsel. Accordingly, the judgment of the Court of Criminal Appeals is reversed, and the case is remanded for a new trial on felony murder and especially aggravated robbery.

### Tenn. R. App. P. 11  Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed

E. RILEY ANDERSON, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and ADOLPHO A. BIRCH, JR., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined.

Jodie A. Bell, Nashville, Tennessee, for the Appellant/Appellee, William Glenn Wiley.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Elizabeth T. Ryan, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Lisa A. Naylor, Assistant District Attorney General, for the Appellant/Appellee, State of Tennessee.

# OPINION

## BACKGROUND

In 1999, the petitioner, William Glenn Wiley, was convicted of felony murder and especially aggravated robbery by a jury in Davidson County, for which he was sentenced to life imprisonment without parole and twenty-five years, respectively. The Court of Criminal Appeals affirmed the convictions and the sentences on appeal, and this Court denied the petitioner's application for permission to appeal.

The petitioner sought post-conviction relief on the basis that the trial court erred in failing to instruct the jury on the lesser-included offense of second degree murder and that he was denied his constitutional right to the effective assistance of counsel at trial. The petitioner also alleged that DNA analysis conducted after trial had established the presence of his own blood at the scene and thus mandated post-conviction relief.

The evidence in the record from the trial and the post-conviction proceedings is set forth below.

### *Trial and Direct Appeals*

On June 6, 1995, the victim, Frank Andrews, was found dead in the bathroom of a motel room in Nashville, Tennessee. The victim's head, which was face down in the toilet, was covered in blood, and there was blood in the toilet. The victim's pockets had been turned inside-out, and his wallet was missing. Blood-stained money totaling $32.50 was found in the bathtub. A cut lamp cord, a phone cord, and a pocketknife were found in the bathroom. The motel room was in disarray, and blood and glass were found on the bed.

The petitioner was employed as a groundskeeper at the motel. On the day the victim was found, the petitioner and his girlfriend, who also worked at the motel, had disappeared without giving notice or picking up their paychecks. Fingerprints recovered from broken bottles in the victim's motel room matched the petitioner's fingerprints.

The petitioner was arrested later in Evansville, Indiana. When questioned, he told police officers that he and the victim had been drinking together all day. He stated that he and the victim got into an argument, that the victim "rushed" him, and that he hit the victim over the head twice with a vodka bottle. After he helped the victim into the bathroom so that the victim could "clean up," the petitioner took the victim's wallet and left. The petitioner told officers that the victim had been alive and talking when the petitioner left the motel and that "he had no idea" that the victim had been severely injured.

Dr. Brucy Levy, Medical Examiner for Davidson County, Tennessee, testified that an autopsy was performed on the victim by Dr. Ann Bucholtz. Dr. Levy testified that he agreed with Dr.

Bucholtz's conclusion that the victim's death was caused by blunt force trauma to the head. According to the autopsy report, the victim suffered a subarachnoid hemorrhage and subdural bleeding. Fifty cubic centimeters of blood was found in the victim's head where he had been struck. Dr. Levy explained that the "amount of blood would take up room that would normally be occupied by the brain" and that "the brain would be pushed out of the way . . . to make room for this hemorrhage." According to Dr. Levy, the victim's "death was caused by not just the bleeding in the brain area but the injuries that the bleeding represent[ed] itself."

Although the autopsy revealed that the victim's blood alcohol content was .34% at the time of his death, Dr. Levy testified that he agreed with Dr. Bucholtz's finding that alcohol poisoning was not the cause of the victim's death. Dr. Levy stated that the autopsy report contained no findings associated with alcohol poisoning, such as brain stem swelling, cerebral edema, pulmonary edema, or aspiration. Moreover, Dr. Levy noted that according to numerous authoritative pathology textbooks, a lethal level of blood alcohol is .40% or above.

Dr. Ann Bucholtz, a medical examiner now located in Phoenix, Arizona, testified that she had performed the autopsy on the victim while working as a medical examiner in Davidson County, Tennessee. She stated that the victim had lacerations to his head and face, scrapes on his arms, and bruising on his arms and hands. She described some of the wounds as "defensive." Although the victim did not have a skull fracture, he had subdural bleeding between his skull and brain. Dr. Bucholtz testified that the cause of the victim's death was blunt force trauma to the head. Although the victim had a .34% blood alcohol content, Dr. Bucholtz stated that the victim did not die of acute alcohol poisoning. She emphasized that lethal levels of blood alcohol content are .40% and above and even higher for chronic alcoholics.

For the defense, the petitioner presented the testimony of Dr. Charles Harlan, a forensic pathologist. Dr. Harlan testified that he had reviewed the autopsy findings and that he believed the victim had died from acute ethyl alcohol poisoning and not blunt force trauma. Dr. Harlan described the victim as a "commode hugging drunk." Although Dr. Harlan conceded that several pathology textbooks define a lethal level of intoxication as .40% and above, he testified that the textbooks were not authoritative. Dr. Harlan also stated that evidence of brain stem swelling, cerebral edema, pulmonary edema, or aspiration is not required for a finding of acute ethyl alcohol poisoning. Dr. Harlan did not discuss the autopsy findings with Dr. Levy or Dr. Bucholtz.

After deliberating, the jury convicted the petitioner of the charged offenses of felony murder and especially aggravated robbery.

The trial then moved into the penalty phase for the jury to decide the petitioner's punishment, i.e., life imprisonment without parole or life imprisonment. The prosecution relied on the petitioner's two prior convictions for robbery as felonies involving violence to a person. See Tenn. Code Ann. § 39-13-204(i)(2) (2003). The prosecution also argued that the killing had occurred in the course of a felony. Id. at (i)(7).

In mitigation, the petitioner testified that he was thirty-two years old at the time of the trial. He testified that his parents divorced when he was ten and that he was raised by his mother. The petitioner left school after the eleventh grade and began working in various construction and factory jobs. Although he admitted that he had pleaded guilty to robbery in Ohio, he explained that he had driven the car after a friend, with whom he had been drinking, stole two purses. The petitioner testified that he was an alcoholic and that he had received counseling for drug and alcohol abuse while in custody for the Ohio offense and had also completed a violence-prevention program.

The petitioner testified that he worked at the motel where the victim was killed. He and the victim met while the petitioner was sitting by the pool and drinking from a cooler of beer. The victim seemed like a "very nice man," and they began drinking together. After finishing the beer, they went to a liquor store and bought vodka and more beer. They returned to the victim's motel room and continued drinking until they were as "drunk as two human beings could be."

The petitioner testified that he and the victim started to argue about whether the victim had given the petitioner money to buy "some dope" and whether the petitioner was "the cab driver." According to the petitioner, the victim "rushed" him, and they "fell up against the dresser." The petitioner then hit the victim with a bottle, and the victim "fell backwards on the bed." After helping the victim get to the bathroom, the petitioner saw the victim's wallet on a night stand. He took the wallet because he knew he "was going to have to be leaving" and was going to "get fired." He put his beer cooler in the car and drove to Kentucky with his girlfriend.

The petitioner testified that he was not aware that the victim had died until he was told by police officers who arrested him in Evansville, Indiana. He testified that he did not realize the victim was seriously injured and that he would have called for help had he known. He testified that he did not know who cut the electrical and telephone cords which were found in the bathroom near the victim.

The jury imposed a punishment of life imprisonment without parole. After a separate sentencing hearing, the trial court imposed a sentence of twenty-five years for especially aggravated robbery, to be served concurrently.

The Court of Criminal Appeals affirmed the convictions and the sentences on direct appeal. This Court denied the petitioner's application for permission to appeal.

*Post-Conviction Proceedings*

After the conclusion of his direct appeals, the petitioner filed a petition in the trial court for post-conviction relief. The petition alleged, among other grounds, that the trial court failed to instruct the jury on the lesser-included offense of second degree murder and that trial counsel was ineffective for failing to request the lesser-included offense instruction, failing to investigate, and failing to raise relevant defenses.

-4-

Prior to the post-conviction evidentiary hearing, the trial court held a hearing on the petitioner's request for DNA testing of a blood-covered towel that had been found at the scene. The petitioner testified that he had been struck in the nose by the victim and that he had used the towel to wipe blood from his face. He contended that the presence of his own blood at the scene would have supported his theory of self-defense. The trial court denied the request pending the post-conviction hearing.

At the post-conviction hearing, trial counsel, Lionel Barrett, testified that he represented the petitioner at trial. Barrett had practiced criminal defense for thirty-four years. He conceded that he did not file a motion to suppress the statement the petitioner had given to arresting officers even though the statement revealed that the petitioner had asked officers for a lawyer. Barrett believed that the statement was "helpful" to the petitioner and "was not damaging."

Barrett said that he reviewed the discovery he had been given, interviewed the officers, and talked to Dr. Charles Harlan. He admitted that he did not talk with a witness named Arthur Lee Woods despite having a report indicating that Woods, a cab driver, had spoken to the victim on the day of the offense. Barrett said that Woods was not present when the offense was committed and that he saw no other relevance to Woods' involvement. He also said that he did not interview Michelle Sheffield, the petitioner's girlfriend, because the petitioner told him she had nothing helpful to add.

Barrett admitted that he could have objected to several comments made by the prosecutor during voir dire, such as the prosecutor's references to the "murder" victim, the victim's "defensive" wounds, and the victim being "cut to shreds." Barrett said that he did not object because he preferred to reserve objections for issues that are "moderately significant."

Barrett testified that his "primary" strategy was to defend against the felony murder charge by trying to "defeat the underlying felony." He conceded, however, that he did not request an instruction on intoxication as a defense to the petitioner's ability to form intent for the underlying felony. He also conceded that he did not request a jury instruction on the lesser-included offense of second degree murder.

Barrett testified that another trial strategy was to show that the victim had died of acute alcohol poisoning since the autopsy showed that the victim's blood alcohol content was .34%. The theory emerged when Barrett was interviewing Dr. Harlan for the purpose of getting background information with which to cross-examine Dr. Levy. Barrett said that he did not know that Dr. Harlan would "volunteer" the opinion that the victim died from acute alcohol poisoning and not blunt force trauma. He was aware at the time that "Dr. Harlan and Dr. Levy were at odds" over work "that had been done by Dr. Harlan." Barrett admitted, however, that he did not file a motion asking that the prosecutor be prevented from asking Dr. Harlan about prior cases he had handled.

Barrett testified that he opted not to object to the introduction of crime scene photographs that he had reviewed prior to trial. He also stated that he did not recall learning about a bloody towel

being found at the crime scene, even though a bloody towel was visible in the crime scene photographs. Although he had no memory of discussing the towel with the petitioner, Barrett agreed that the presence of the petitioner's blood would have made him "optimistic about a self defense theory." In addition, Barrett admitted that he did not investigate whether the victim had prior convictions for assaultive conduct because he did not think such convictions would have been admissible.

Barrett believed that the electrical and telephone cords found in the bathroom were the most damaging aspect of the case. Although he considered whether to argue that they were of an "unusual sexual nature," he opted to "simply stay away from it" because there was no evidence the victim had been tied up.

Barrett testified that the petitioner did not testify during the guilt phase because the trial court had ruled that the petitioner's prior robbery convictions were admissible to impeach the petitioner. Barrett did not recall discussing with the petitioner whether the petitioner's decision not to testify impacted a possible self-defense theory.

Barrett testified that the defense attempted to obtain the lesser punishment of life with the possibility of parole. He conceded, however, that he "assumed" that the defendant's prior robbery convictions were crimes of "violence" for the purpose of the prosecution's aggravating circumstance but that he never researched the issue under Ohio law. In addition, Barrett admitted that he did not object to or request a jury instruction on the prosecution's use of victim impact evidence.

The petitioner testified that he met with Barrett four to six times prior to trial. He told trial counsel that he had been drinking with the victim until an argument ensued over whether the victim had given him money. He told counsel that the victim "rushed" him, and they fell against a dresser. The petitioner then grabbed a bottle, struck the victim twice in the head, and pushed him backwards onto the bed. After helping the victim get to the bathroom, he took the victim's wallet and left. The petitioner testified that trial counsel told him that they would pursue a self-defense theory at trial.

The petitioner said that trial counsel did not ask him about his arrest or his request for counsel. Trial counsel also did not interview the petitioner's girlfriend or any motel employees. The petitioner said that he did not learn about the bloody towel until it was introduced into evidence at trial. When he told counsel "that is my blood on that towel," counsel said "it did not matter." He testified that trial counsel did not prepare him to testify or pursue self-defense. The petitioner admitted that he never told police officers or trial counsel that he had been struck in the nose and had been bleeding. Finally, the petitioner said that trial counsel did not prepare him to testify during the sentencing phase.

Barbara Williams, the petitioner's mother, stated that she testified on behalf of her son in the sentencing phase of his trial. She said that Barrett did not ask her for the names of other mitigating witnesses or character witnesses. She was also not asked to testify about her son's background and history of alcohol abuse.

Williams further testified that at the request of the petitioner's post-conviction counsel, she obtained copies of the victim's prior criminal record. The victim had a 1993 conviction for battery in Florida and a 1994 arrest for battery in Florida. The latter charge was dismissed.

At the conclusion of the post-conviction hearing, the trial court reconsidered and granted the petitioner's request for DNA analysis of the towel found at the crime scene. The DNA testing established that the petitioner's blood was on the towel.

After considering the evidence and arguments of counsel, the trial court granted a new trial as to the felony murder because the jury was not instructed on the lesser-included offense of second degree murder. The court reasoned that State v. Ely, 48 S.W.3d 710, 721 (Tenn. 2001), which held that second degree murder is a lesser- included offense of felony murder, applied retroactively to post-conviction cases. The trial court denied post-conviction relief as to especially aggravated robbery, however, after concluding that the petitioner was not denied the effective assistance of counsel and that the DNA results would not have affected the outcome at trial.

The Court of Criminal Appeals affirmed the trial court's ruling. Like the trial court, the intermediate appeals court concluded that second degree murder is a lesser-included offense of felony murder under Ely. The court further concluded that Ely and State v. Burns, 6 S.W.3d 453, 471 (Tenn. 1999), in which this Court clarified the framework for determining lesser-included offenses, "enhanced the integrity and reliability of the fact-finding process" and thus created a new constitutional rule requiring retroactive application. The Court of Criminal Appeals affirmed the trial court's denial of relief as to the especially aggravated robbery conviction.

We granted this appeal.

## ANALYSIS

### I.
### *Post-Conviction Procedures*

Post-conviction relief "shall be granted when [a petitioner's] conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2003). A petitioner must establish the allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003).

A ground for relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g) (2003). A ground for relief is not waived, however, if it is "based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right"

or if "[t]he failure to present the ground was the result of state action in violation of the federal or state constitution."  Tenn. Code Ann. § 40-30-106(g)(1) - (2).[1]

A trial court's findings of fact in a post-conviction proceeding are conclusive on appeal unless the evidence in the record preponderates against them.  Burns, 6 S.W.3d at 461.  When reviewing factual issues, the appellate court will not re-weigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony.  Id.; Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).  When reviewing legal issues or a mixed question of law and fact, such as an ineffective assistance of counsel claim, the appellate court's review is de novo with no presumption of correctness.  See Fields v. State, 40 S.W.3d 450, 457 (Tenn. 2001).

## II.
### *Lesser-Included Offenses*

The State argues that the trial court and the Court of Criminal Appeals erred in granting post-conviction relief because (a) second degree murder was not a lesser- included offense of "reckless" felony murder, which was applicable at the time of the petitioner's offense, and (b) Burns did not establish a new constitutional rule requiring retroactive application in post-conviction cases.  The petitioner maintains that the trial court and the Court of Criminal Appeals properly granted a new trial after concluding that the jury should have been instructed on the lesser-included offense of second degree murder.

We begin by reviewing the statutory definitions of felony murder and second degree murder at the time the victim was killed on June 6, 1995.  Felony murder required "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy."  Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 1993).  Second degree murder required a "knowing" killing of another.  Tenn. Code Ann. § 39-13-210(a)(1) (1991).

At the time the offenses were committed, but prior to the petitioner's trial, the Court of Criminal Appeals had concluded that second degree murder was not a lesser-included offense of a "reckless" felony murder.  State v. Gilliam, 901 S.W.2d 385 (Tenn. Crim. App. 1995).  The court had reasoned:

> When acting recklessly establishes an element, that element is also established if the defendant acted knowingly.  Conversely, when acting knowingly establishes an element, that element is *not* established if the defendant acted only recklessly.  Therefore, in order to find a defendant guilty of second-degree murder, an element not

---

[1] A ground for relief "is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing."  Tenn. Code Ann. § 40-30-106(h) (2003).

contained in first-degree felony murder (the mental element of "knowing") must be established. It follows that, under Howard, second-degree murder is not a lesser included offense of first-degree felony murder.

Id. at 390-91 (citing Howard v. State, 578 S.W.2d 83 (Tenn. 1979)).

After Gilliam, however, (and still before the petitioner's trial), this Court held that defendants are entitled to jury instructions on both lesser-included and lesser-grade offenses. See State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996). In stating that "the grades or classes of any offense are established by statute," the Court gave the following example: "[I]n Tennessee Code Annotated Sections 39-13-201 through 213, the legislature had divided criminal homicide into the grades of first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide, and vehicular homicide." Id. The Court emphasized that "a defendant charged with an offense is entitled to a jury instruction on lesser grades or classes of the charged offense supported by the evidence" even absent a request to do so. Id.; see also Tenn. Code Ann. § 40-18-110 (1997) (A trial court must "charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so.").

Accordingly, at the time of the petitioner's trial in April of 1999, Trusty was the controlling authority on lesser-included (and lesser-grade) offenses. The trial court, however, failed to instruct the jury on second degree murder even though it was required to do so under Trusty. See Ely, 48 S.W.3d 722-23 (noting that second degree murder was a lesser grade of homicide under Trusty). Moreover, trial counsel did not request the instruction or otherwise preserve the issue for direct appeal.

In analyzing this issue, both the trial court and the Court of Criminal Appeals concluded that second degree murder was not a lesser-included offense of felony murder under Gilliam without considering Trusty. Moreover, both courts applied the later decisions after trial in Burns, 6 S.W.3d at 466, and Ely, 48 S.W.3d at 727. In Burns, which was decided on the same day the petitioner filed his notice of appeal, the Court clarified that an offense is a lesser-included offense of another if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
>> (1) a different mental state indicating a lesser kind of culpability; and/or
>>
>> (2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Id. at 466-67. We further said that the trial court must first determine whether "any evidence exists that reasonable minds could accept as to the lesser-included offense" and then "determine whether the evidence viewed in this light is legally sufficient to support a conviction for the lesser-included offense." Id. at 469.

In applying Burns, we later held in Ely that second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder. Ely, 48 S.W.3d at 721. In that case, however, we addressed the present version of felony murder, which no longer requires that the killing be "reckless." See Tenn. Code Ann. § 39-13-202(a)(2) (1997). We explained:

After comparing the respective elements of felony murder, second degree murder, reckless homicide, and criminally negligent homicide, it appears that the elements of the lesser offenses are a subset of the elements of the greater and otherwise differ only in the mental state required. We hold that because the mental states required for the lesser offenses differ only in the level of culpability attached to each in terms of seriousness and punishment, the offenses of second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder under part (b) of the Burns test.

Ely, 48 S.W.3d at 721-22 (emphasis added).

In our view, the trial court and the Court of Criminal Appeals erred in granting post-conviction relief on this issue. At the time of the trial, the petitioner was entitled to an instruction on second degree murder as a lesser offense of felony murder under our decision in Trusty. Trusty, 919 S.W.2d at 310. The trial court was obligated to give such an instruction even absent a request by the defendant. See id.; Tenn. Code Ann. § 40-18-110 (1997). The trial court's error under Trusty could have been presented on direct appeal but was not. Moreover, because the petitioner's notice

-10-

of appeal was filed on the day that <u>Burns</u> was decided, the petitioner's direct appeal would have been in the appellate "pipeline" for review under <u>Burns</u>. Accordingly, the issue was waived for post-conviction purposes. Tenn. Code Ann. § 40-30-106(g) (1997).

It follows from our holding that the trial court and Court of Criminal Appeals erred in applying both <u>Burns</u> and <u>Ely</u> retroactively to this post-conviction case. As we clarified in <u>Ely</u>, "[o]ur intent in formulating the <u>Burns</u> test was to provide trial courts and litigants with a more simple and predictable method of determining whether a particular lesser offense was included in a greater offense." <u>Ely</u>, 48 S.W.3d at 719. Indeed, part (a) of the <u>Burns</u> test was simply a "re-adoption" of the <u>Howard</u> statutory analysis test. <u>Burns</u>, 6 S.W.3d at 466 (citing <u>Howard v. State</u>, 578 S.W.2d 83 (Tenn. 1979)). Part (b) of the <u>Burns</u> test clarified the analysis where offenses are "logically related" to the greater offense, and part (c) of the <u>Burns</u> test clarified the analysis where offenses involve attempts, facilitation, and solicitation. <u>Burns</u>, 6 S.W.3d at 466; <u>see also</u> <u>Ely</u>, 48 S.W.3d at 719.

There is no language in <u>Burns</u> suggesting that the Court fashioned a new constitutional rule for retroactive application in post-conviction cases. Although both <u>Burns</u> and <u>Ely</u> recognized that the doctrine of lesser offenses implicated the integrity and reliability of the fact-finding process, that has long been the case. <u>See</u> <u>Howard</u>, 578 S.W.2d at 84-85. As we said in <u>Ely</u>, for instance, "our holding that the right to lesser-included offense instructions is of constitutional dimensions does not announce a new constitutional rule." 48 S.W.3d at 727.

Accordingly, we hold that the trial court's failure to instruct the jury on the lesser-included offense of felony murder was waived for post-conviction relief and the analysis in <u>Burns</u> and <u>Ely</u> was not applicable.

### III.
### *DNA Testing*

The petitioner argues that the trial court erred in denying post-conviction relief on the ground that DNA analysis established the presence of the petitioner's blood on a towel found at the crime scene. The petitioner claimed that the presence of his blood on the towel showed that he had been struck by the victim and that he acted in self-defense. In response, the State maintains that the results of the DNA analysis did not mandate that post-conviction relief be granted.

We begin our analysis of this issue with the DNA Analysis Act of 2001, which provides that a defendant who has been convicted and sentenced for first degree murder

> may at any time, file a petition requesting the forensic DNA analysis
> of any evidence that is in the possession or control of the prosecution,
> law enforcement, laboratory, or court, and that is related to the
> investigation or prosecution that resulted in the judgment of
> conviction and that may contain biological evidence.

Tenn. Code Ann. § 40-30-303 (2003). A petition for DNA analysis may be granted where the court finds:

> (1) A reasonable probability exists that analysis of the evidence will produce DNA results which would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-305(1)-(4) (2003).

We agree with the trial court's conclusion that the results of the DNA testing in this case did not warrant post-conviction relief. Although the analysis established the presence of the petitioner's blood at the crime scene, that evidence alone did not establish the petitioner's innocence of the offenses. Moreover, the results of the DNA testing did not alone establish that "the petitioner's verdict or sentence [would have been] more favorable if the results had been available at the proceeding leading to the judgment of conviction." Tenn. Code Ann. § 40-30-305(1).

In addition, we agree with the Court of Criminal Appeals' conclusion that the DNA Relief Act does not *mandate* relief upon finding that a result is favorable to the petitioner. The Act provides only that "if the results of the post-conviction DNA analysis are favorable, the court shall order a hearing . . . and thereafter make such orders as are required . . . ." Tenn. Code Ann. § 40-30-312. The Act does not expressly mandate post-conviction relief in the form of a new trial upon a finding that the DNA analysis is in any way favorable to the petitioner.

Accordingly, we agree with the trial court's conclusion that the DNA analysis did not alone mandate post-conviction relief.

## IV.
### *Ineffective Assistance of Counsel*

The petitioner next argues that the trial court erred in denying post-conviction relief on the basis of ineffective assistance of counsel. The petitioner asserts that trial counsel was ineffective in

(a) failing to request a jury instruction on second degree murder, (b) failing to develop a reasonable trial strategy on self-defense, (c) failing to develop a reasonable trial strategy on intoxication, (d) failing to interview witnesses, (e) failing to object during voir dire, (f) failing to object to photographs, and (g) failing to research the petitioner's prior robbery convictions under Ohio law or to object to victim impact testimony during sentencing. The State argues that the trial court and the Court of Criminal Appeals properly concluded that the petitioner was not denied the effective assistance of counsel.

To establish ineffective assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, a petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 692 (1984); Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). A petitioner's failure to prove either the deficiency or the prejudice prong provides a sufficient basis to deny relief on the ineffective assistance claim. Strickland, 466 U.S. at 692.

To prove a deficiency in counsel's performance, a petitioner must show that counsel's acts or omissions were so serious that they fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). As this Court has observed:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interests, undeflected by conflicting considerations . . . .

Id. at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974) (citations omitted)). In reviewing counsel's conduct, a "fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

To establish that a deficiency resulted in prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 695. In short, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. Burns, 6 S.W.3d at 463.

### a. Lesser-Included Offense Instruction

We first address whether the petitioner's counsel was ineffective for failing to request a jury instruction on second degree murder. As discussed earlier in this opinion, the trial court failed to instruct the jury on second degree murder as a lesser offense of felony murder. Moreover, trial counsel failed to request such an instruction, failed to raise the issue in a motion for a new trial, and failed to otherwise preserve the trial court's error for appeal.

At the post-conviction hearing, trial counsel, Lionel Barrett, testified that he had "no independent memory as to why [second degree murder was] not charged in instructions as a lesser included offense of felony murder." Barrett further admitted that "it would be . . . pretty difficult to find a case in which second degree would . . . not be a part of a first degree."

We conclude that counsel was deficient in failing to request an instruction on second degree murder and in failing to preserve the issue for appeal. At the time of the petitioner's *offense*, felony murder required a "reckless" killing in the commission or the attempted commission of an enumerated felony, Tenn. Code Ann. § 39-13-202(a)(2), and second degree murder required a "knowing killing of another." Tenn. Code Ann. § 39-13-210. Moreover, at the time of the petitioner's *trial*, the trial court was required to instruct the jury on second degree murder as a lesser grade offense under this Court's decision in Trusty. 919 S.W.2d at 310. Although the trial court was required to instruct the jury on this lesser offense even without a request by counsel, see Tenn. Code Ann. § 40-18-110, trial counsel failed to object, failed to raise the error in a motion for new trial, and failed to take any other step toward preserving the issue for appeal.

We also conclude that counsel's deficiency was prejudicial. As the trial court specifically found in the post-conviction proceeding, the evidence at trial supported an instruction on second degree murder: "Given the facts in this case, including the petitioner's statement to the police, and the scene of the crime, a reasonable juror might conclude that the petitioner was guilty of second degree murder." See State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002). As a result, the failure to instruct on second degree murder as required at the time under Trusty would have been reversible error on direct appeal if the issue had been preserved.

In addition, had the issue been preserved and raised on appeal, the petitioner's direct appeal would have been in the appellate "pipeline" for review under Burns. As discussed above, second degree murder is a lesser-included offense of the present version of felony murder under Burns. See Ely, 48 S.W.3d at 720. Moreover, second degree murder was also a lesser-included offense of the former version of felony murder because the mental state for felony murder was the "intent" to commit the underlying felony (resulting in a reckless killing), and the mental state for second degree murder was a "knowing" killing. As a result, second degree murder had a "different mental state indicating a lesser kind of culpability" than did the former version of felony murder. See Burns, 6 S.W.3d at 461; see also Ely, 48 S.W.3d at 720-21. Since the evidence supported an instruction on second degree murder, the failure to instruct on second degree murder would have been reversible error under Burns.

-14-

Accordingly, we conclude that trial counsel was deficient in failing to preserve this issue and that the deficiency was prejudicial to the petitioner. We therefore remand for a new trial on the offense of felony murder.

### b. Self-Defense

We next address whether petitioner's counsel was ineffective in failing to assert self-defense as a trial strategy or request a jury instruction on self-defense.

At the post-conviction hearing, trial counsel testified that his strategies at trial were to "defeat the underlying felony" for felony murder and to show that the victim had died from acute alcohol poisoning. Counsel testified that the petitioner told him that he and the victim had an argument and that the victim "rushed" him. Counsel also knew that the petitioner had told police officers these facts. Counsel testified, however, that the petitioner did not tell him he had been struck in the nose or that he had bled. Counsel acknowledged that he would have been "optimistic" about self-defense had he known about the bloody towel and the presence of the petitioner's blood at the crime scene.

The petitioner likewise testified that he told police officers and trial counsel that the victim had "rushed" him after an argument. The petitioner testified that trial counsel told him they would raise self-defense at trial. The petitioner acknowledged that he did not tell police officers or trial counsel that he had been struck in the nose or had bled. He nonetheless asserted that trial counsel should have discovered the bloody towel and had the DNA testing performed before trial.

In denying relief on this issue, the trial court found that it "could not reconcile" the petitioner's testimony during post-conviction with his prior statements:

> Twice before the petitioner had a full opportunity to tell his story and twice before he failed to mention the punch in the nose. To the police in Indiana at the time of his arrest all he said to explain the altercation was 'then one thing led to another' and in the sentencing phase of the trial all he said was 'he rushed me.'

The trial court therefore accredited counsel's testimony that the petitioner did not tell him about his bloody nose. In addition, after detailing the nature of the attack on the victim and the victim's defensive wounds, the trial court found that the petitioner's testimony at post-conviction could not be reconciled "with the condition of the victim and the bathroom where he was found." Finally, the trial court said that self-defense did "not authorize beating the victim to death." The Court of Criminal Appeals agreed with the trial court's findings.

The effective assistance of counsel necessarily requires counsel to "conduct appropriate investigations, both factual and legal," and to assert defenses "in a proper and timely manner." Baxter, 523 S.W.2d at 932, 935. As the United States Supreme Court has said, "counsel has the duty to make reasonable investigations or to make a reasonable decision that makes particular

investigations unnecessary." Strickland, 466 U.S. at 691. Counsel's conduct must be "assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Burns, 6 S.W.3d at 462.

The defense of self-defense provides that "[a] person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force." Tenn. Code Ann. § 39-11-611(a). "The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury" and the "danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds . . . ." Id.

We conclude that trial counsel was deficient in failing to investigate and assert self-defense. Trial counsel admitted that he knew that the petitioner told police that he and the victim had argued, that the victim had "rushed" him, and that he and the victim had fallen into a dresser. Trial counsel also admitted that the petitioner told him the same version of the events. Although the petitioner did not mention his bloody nose, reasonably diligent counsel would have inferred grounds for self-defense from the argument between the petitioner and the victim and from the petitioner's consistent allegation that he had been "rushed" by the victim. Moreover, reasonably diligent counsel would have conducted additional investigation to vigorously pursue that strategy.

We further conclude that the petitioner presented evidence in the post-conviction proceeding to establish that counsel's deficiency was prejudicial. A self-defense claim would have been corroborated by evidence of the bloody towel with the petitioner's blood found at the scene. Indeed, blood-stained towels are visible in two of the crime scene photographs. In addition, the self-defense claim would have been further corroborated by evidence of the victim's prior conviction for battery in Florida. Contrary to counsel's testimony in post-conviction, case law at the time of the petitioner's trial established that the petitioner need not have been aware of the victim's prior offenses to argue that the victim was the first aggressor. See State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995). In sum, trial counsel's failure to pursue self-defense prevented the jury from considering the relevant circumstances of the offenses and more probably than not affected the outcome of the trial.

In reaching these conclusions, we disagree with the trial court's conclusion that self-defense was inapplicable because deadly force was not justified. Instead, a jury properly instructed on the law of self-defense would have been responsible for determining whether the petitioner had a reasonable apprehension of imminent death or serious bodily injury and if so, whether the petitioner's actions amounted to self-defense. We also disagree with the Court of Criminal Appeals' conclusion that self-defense was inapplicable against a felony murder charge. For the reasons discussed above, trial counsel's deficient performance resulted in the failure to instruct the jury on the lesser offense of second degree murder – a charge against which self-defense is entirely appropriate for the jury's consideration.

Accordingly, we conclude that trial counsel was deficient in failing to pursue and assert self-defense as a defense and that the petitioner was prejudiced as a result. The case must therefore be remanded for a new trial on both the felony murder and especially aggravated robbery charges.

## c. Intoxication Defense

We next address whether trial counsel was ineffective in failing to develop an intoxication defense and in failing to request a jury instruction on intoxication.

Evidence of a defendant's intoxication is relevant to negate a culpable mental state of a charged offense. See Tenn. Code Ann. § 39-11-503(a) (2003). Although felony murder in the present case required a "reckless" killing, evidence of intoxication may have been admitted to negate the intent required in committing the felony underlying a felony murder charge. See State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999).

Although the issue is fairly close, we cannot conclude that trial counsel was deficient for failing to investigate and raise the issue of intoxication. On one hand, trial counsel was aware that the petitioner told police officers that he was "drunk" at the time of the incident with the victim, and the crime scene photographs revealed the presence of numerous beer cans and liquor bottles. Moreover, trial counsel testified that his primary strategy was to "defeat" the underlying felony for felony murder, a strategy that may have been aided by an intoxication defense. On the other hand, there was no evidence that the petitioner was so intoxicated as to impair his mental state. Indeed, the petitioner told police officers his version of the events that day and later told trial counsel the same version. Although the trial transcript reveals that the petitioner elected not to testify in the guilt phase of the trial, he testified and related his version of the events during the sentencing phase. At no point did the petitioner assert that he lacked intent or that he did not recall the events due to his level of impairment. The petitioner also introduced no evidence during post-conviction that would have supported this defense. Accordingly, we conclude that trial counsel was not ineffective in this regard.

## d. Failing to Interview Witnesses

We next turn to the petitioner's argument that trial counsel was ineffective for failing to interview witnesses. In particular, the petitioner argues that trial counsel should have interviewed the cab driver, other motel employees, and his girlfriend at the time of the offenses. These three witnesses, however, did not testify at the post-conviction hearing. Accordingly, the petitioner did not prove either that trial counsel was deficient or that he was prejudiced as a result.

## e. Voir Dire

The petitioner asserts that trial counsel was ineffective for failing to object to numerous comments made by the prosecutor during voir dire. In particular, the petitioner notes that trial counsel did not object when the prosecutor referred to the victim as a "good guy" and a "murder"

-17-

victim who had been "cut to shreds." Trial counsel said that he did not object because he preferred to reserve objections for issues that are "moderately significant."

Although we caution that attorneys must be temperate and not inflammatory during voir dire, we cannot second-guess trial counsel's basis for not objecting to the prosecutor's comments. In addition, the petitioner has not shown that the defense was prejudiced, that he was forced to accept a juror that was prejudiced against him, or that any other harm resulted from counsel's conduct. As a result, the petitioner has failed to show deficiency or prejudice.

### f. Crime Scene Photographs

The petitioner next asserts that trial counsel was ineffective in failing to object to the admission of crime scene photographs. The photographs showed the victim lying in the motel room bathroom with his head over the toilet. Other photographs showed the injuries to the victim's face and head. Trial counsel testified that he saw the photographs before trial and believed they were relevant to support the State's theory of the offense. As a result, he saw no meritorious basis upon which to object to their admission at trial.

The admissibility of photographs is left to the discretion of the trial court. See State v. Carter, 114 S.W.3d 895, 902 (Tenn. 2003). Even photos that are graphic or gruesome may be admitted if they are relevant to a material issue at trial and their probative value is not substantially outweighed by the risk of unfair prejudice. See Tenn. R. Evid. 403. In this case, we agree with the trial court and the Court of Criminal Appeals that the petitioner has failed to show that trial counsel was deficient in this regard or that the petitioner was prejudiced as a result.

### g. Sentencing Phase

Finally, the petitioner argues that trial counsel was ineffective with regard to the sentencing phase in which the prosecution sought the punishment of life without parole. In particular, the petitioner asserts that counsel failed to investigate his prior robbery convictions under Ohio law to determine whether the statutory elements involved violence to a person and failed to object to "victim impact" testimony.

Because we have concluded that a new trial must be held on felony murder, the issues relating to trial counsel's performance in the sentencing phase need not be addressed. However, we opt to make a few comments for guidance in the event the petitioner is again convicted of felony murder and a new sentencing proceeding is held.

The prosecution relied upon the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2), which states that "the defendant was previously convicted of one (1) or more felonies . . . whose statutory elements involve the use of violence to the person." As the Court of Criminal Appeals noted, the Ohio robbery statute stated that "[n]o person, in attempting or

committing a theft offense, . . . or in fleeing after such attempt or offense, <u>shall use or threaten</u> the immediate use of force against another." Ohio R.C. Ann. § 2911.02(A)(1987) (emphasis added).

In applying the (i)(2) aggravating circumstance, this Court has stated that some offenses may require evidence of the circumstances underlying the prior conviction: "We hold that the trial judge must necessarily examine the facts underlying the prior felony if the statutory elements of that felony may be satisfied either with or without proof of violence." <u>State v. Sims</u>, 45 S.W.3d 1, 11-12 (Tenn. 2001). Because the petitioner's initial trial was held before <u>Sims</u> was decided, any subsequent sentencing hearing in which the prosecution relies upon the (i)(2) aggravating circumstance shall be held in accordance with these procedures. <u>Id.</u>

Similarly, in analyzing the admissibility of victim impact evidence, this Court has emphasized that such proof must be limited to

> information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding an individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

<u>State v. Nesbit</u>, 978 S.W.2d 872, 891 (Tenn. 1998). In addition, the Court also created procedures that require the State to give notice of its intent to use victim impact evidence and require the trial court to hold a jury out hearing to determine the admissibility of the evidence. <u>Id.</u> Accordingly, these procedures should be followed in the event the petitioner is again convicted of felony murder and a new sentencing is held.

## CONCLUSION

After due consideration, we conclude 1) that <u>State v. Burns</u> did not create a new constitutional rule that must be retroactively applied to post-conviction cases, 2) that the petitioner was not entitled to a new trial or other relief based on DNA results, and 3) that the petitioner was denied his constitutional right to effective assistance of counsel. Accordingly, the judgment of the Court of Criminal Appeals is reversed, and the case is remanded for a new trial on felony murder and especially aggravated robbery. The costs of the appeal are taxed to the State.

 

_____
E. RILEY ANDERSON, JUSTICE